<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GREGORY DEAS & KYSHON WILLIAMS | No. 23cr353 (EP)<br><br>**OPINION** |

**PADIN**, **District Judge.**

On July 11, 2022, Defendants Gregory Deas and Kyshon Williams were arrested after a warrantless stop and search of Deas' car uncovered drugs and money. From this search, and later, a search of Deas' home pursuant to a search warrant, Deas was charged with possession with intent to distribute 400 grams or more of fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), and both Deas and Williams were charged with distribution with the intent to distribute 40 grams or more of a mixture containing fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). D.E. 28 ("Indictment").

Deas moves to suppress the evidence seized from his car and from his residence. D.E. 46 ("Deas Motion" or "Deas Mot."). Williams moves to suppress the evidence sized from Deas' car and to sever his case. D.E. 39 ("Williams Motion" or "Williams Mot."). The Government opposes both motions. D.E. 47 ("Opp'n"). For the reasons below, the Court will **DENY** both motions.

I.   BACKGROUND[1]

    A.   The Confidential Source[2]

        *1.   The CS approaches law enforcement*

In June 2022, an individual approached law enforcement to become a CS. D.E. 47-1 ("Amendola Affidavit"[3]) ¶ 8. The CS told law enforcement that he feared for his life because he owed Deas, his narcotics supplier, approximately $30,000. Opp'n at 1-2; *see also* D.E. 48-1, Ex. B ("June 1 FBI Report") at US000431. Law enforcement agreed to pay the CS's $30,000 debt in exchange for the CS's cooperation, which included the CS wearing an audio and video recording device when he next met with Deas. Amendola Affidavit ¶ 10.

Subsequent to their initial meeting with the CS, law enforcement searched the National Crime Information Center database for Deas' criminal history. Opp'n at 3. The database revealed that Deas had three prior felony convictions for narcotics-distribution offenses. *Id.* at 3-4.

---

[1] These facts are drawn in part from the footage obtained from audio and video recordings, which may be relied upon for a suppression motion. *See United States v. Raddatz*, 447 U.S. 667, 679 (1980). The Court cites to key excerpts from the recordings, which were provided by the Government pursuant to this Court's Order, D.E. 58.

[2] Throughout their briefs, Defendants repeatedly dispute the reliability of the Confidential Source ("CS") by raising purported contradictions and inconsistencies in the information he provided to law enforcement. *See, e.g.,* D.E. 53 ("Deas Reply") at 2 (providing a list of five apparent inconsistencies). The Court thoroughly considered Defendants' arguments. Given these disputes, the Court does not rely on any contested facts from the CS throughout this Opinion. As explained *infra*, however, the Court need not rely on any contested information provided by the CS to reach its conclusion that law enforcement's actions were lawful. As explained *infra*, the three recordings of Deas and the CS provided law enforcement with the requisite reasonable suspicion to investigate on July 11, 2022.

[3] The Amendola Affidavit is a search warrant application completed by Federal Bureau of Investigation Special Agent Matthew Amendola on July 11, 2022 to search Deas' home.

        2.        *The June 2, 2022 meeting between the CS and Deas*[4]

On June 2, 2022, while the CS was wearing a wire, Deas went to the CS's home to collect the $30,000. Amendola Affidavit ¶ 11. As the two spoke, the CS grabbed cash from a plastic bag and handed it to Deas; the CS told Deas, "that's everything." Controlled_Money_Drop_06-02_2022.001 ("June 2 Recording 1") at 38:30-39:07. The two then discuss several components of Deas' drug enterprise, including their prior drug transaction (which led to the $30,000 debt) and information about Deas' supplier and the prices Deas pays for bricks of heroin. *See id.* at 39:35-41:01; Controlled_Money_Drop_06-02_2022.001 ("June 2 Recording 2") at 00:00-00:48. For example, Deas told the CS, "Whatever number y'all looking for, trust me, I can't, I can't do it . . . I said . . . I can't . . . I told them mother f*******, 'Best case scenario … if you want to get 500 [bricks] for 95 [dollars] I'll put your money on the move, give you that type of breathing room." June 2 Recording 2 at 5:52-6:15. The CS mentions different stamps of heroin, including "Amber Alert" and "Bitcoin." *Id.* at 6:47-7:20. Specifically, the CS calls "Bitcoin" "some bull****," and Deas replies, "You know what's weird? Down in the hood, that's what they love," and then laughs. *Id.*

---

[4] The Court reviewed the approximately three hours of recordings provided by the Government and only includes key excerpts in the Opinion. Subsequent to its review, the Court ordered the parties to provide their respective views as to the most relevant timestamps in the videos. D.E. 65.

In his response, Deas, for the first time, disputes he is the individual in the recordings. D.E. 69. The Court agrees with the Government that Deas waived this argument for purposes of his Motion because Deas failed to raise this argument in his Motion. *See Aiellos v. Zisa*, No. 09-3076, 2009 WL 3486301, at *1 (D.N.J. Oct. 20, 2009) ("It is hornbook law that arguments raised for the first time in a reply brief are waived."). The Government notes it produced the video recordings to Deas in June 2023 and thus Deas had ample opportunity to raise this argument in his Motion. D.E. 71 at 2. In addition, the Court finds Deas further waived this argument regarding identity because Deas acknowledges in his Motion the controlled money drop shown in the June 2, 2022 recording and he does not dispute the identity of the individual in the video. *See* D.E. 46 at 3.

Later, the CS and Deas arrange another drug deal. *See* June 2 Recording 2 at 10:55-11:05 (Deas replies "Ok" after the CS tells him that he "might need another 150"). The CS and Deas also discuss keeping their transactions discrete. Deas tells the CS, "I just can't keep walking out with big ass bags and s*** . . . . I can't keep walking in and out of this girl's house with these f****** bags and s***." June 2 Recording 2 at 15:22-15:42. The CS then asks, "So, is this place [referring to CS's residence] safer for you?" Deas responds, "Definitely . . . . Just tell him [the CS's partner in Camden] communication is everything." *Id.* at 15:44-15:58. Deas also mentions that his supplier is soon heading out of town for an extended period of time. *Id.* at 11:15-11:55. Beginning on June 14, 2022, law enforcement conducted regular surveillance of Deas. Amendola Affidavit ¶ 17.

        3.      *The June 15, 2022 meeting between the CS and Deas*

On June 15, 2022, the CS recorded another in-person conversation at his home between himself and Deas. Opp'n at 6. Toward the beginning of the conversation, Deas provides the CS with information about how much money the narcotics sell for and how much product he moves:

> Y'all get 130 and up, some of y'all get 150, 130, y'all eating my n***a so … I said, a bad week for y'all is 2-250. But y'all normally stay anywhere between 350 and 4 . . . and then really, then they close to 5. So, I'm sitting there looking like, yo, ain't nobody else out here in the hood really moving like that . . . you know what I'm saying . . . I said, unless n***as is selling weight, but I said, other than that, **mother******* just ain't out here just moving 4-500 bricks a week. I said, I said, trust me, I know this.**

heroin_drop_conversation_with_DEAS.001 ("June 15 Recording") at 15:40-16:22 (emphasis added).

Deas again mentioned that his Washington Heights-based supplier was imminently leaving town for a few weeks, and that he was placing a larger order so that he would not run out of narcotics to sell during that time. *Id.* at 19:45-19:58 ("They gotta load me up 'til the f****** end of July."). Deas recounted for the CS, in depth, a conversation Deas had with his supplier. Deas

4

asked his supplier to tell him how long the supplier expected to be out of town so Deas could tell him what he "needed." *Id.* at 20:30-42. After Deas stated how much he needed, the supplier told Deas he might need to make two trips to deliver the narcotics given the size of Deas' order. *Id.* at 21:07-21. Deas also shared with the CS more information about the logistics of how the supplier delivers the drugs, including the use of a three-car convoy to distract police. *Id.* at 21:34- 22:04.

### 4. *The June 17, 2022 meeting between the CS and Deas*

Two days later, Deas returned to the CS's home. Immediately upon entering, Deas placed two bags of a white powdery substance[5] on the counter.[6] Gregory_Deas_Recorded_Convo_06-17-2022.001.cam1.part02 ("June 17 Recording 2") at 10:21. Deas and the CS also discussed Deas having to front $30,000 to $40,000 of his own money to his supplier to cover for the CS, who was overdue on a debt to Deas. *See id.* at 11:37-11:46.

On June 17, 2022, law enforcement also obtained a search warrant, which allowed them to obtain prospective GPS location data from Deas' phone and for law enforcement to install and use a pen register and trap and trace device on his phone. Opp'n at 6.

### B. The July 11, 2022 Arrest

Just after 2:00 PM on July 11, 2022, law enforcement, using the pen trap and trace on Deas' cell phone, observed Deas driving towards Williams' residence, and consequently surveilled the area. Amendola Affidavit ¶ 18. At 2:24 PM, law enforcement saw Williams enter a silver Nissan Rogue near his home. *Id.* At 2:30 PM, Deas arrived in a Kia Optima and parked close to Williams'

---

[5] "Based on the packaging and appearance, law enforcement suspected that the white powdery substance inside the two baggies was cocaine." Opp'n at 8. Later in the conversation, Deas gestures toward the bag and says, "that's 150," Gregory_Deas_Recorded_Convo_06-17-2022.002.cam1 ("June 17 Recording 3") at 5:50, which the Government avers is a reference to 150 grams of cocaine. Opp'n at 8.

[6] According to the Government, the drug transaction seen in this video was made without law enforcement's prior knowledge or consent. Opp'n at 8.

car. *Id.* Williams then exited the Nissan and entered the Kia's front passenger seat, carrying a white or striped bag when he walked towards Deas' car. *See id.* ¶ 19; Deas Mot. at 4; Opp'n at 11. At 2:49 PM, with both men still inside the Kia, law enforcement boxed in the Kia from the front and rear, and directed Deas and Williams to exit the car. Amendola Affidavit ¶ 19; Opp'n at 11-12. At least one officer had his gun drawn, and the two men were ordered out of the car and handcuffed pending further investigation. Williams Mot. at 3; Opp'n at 12.

As Deas exited the vehicle, law enforcement claims that they saw, in plain view, the black and white bag that Williams had carried into the car on the front driver's side floorboard, directly in front of where Deas was sitting. Amendola Affidavit ¶ 19; Opp'n at 12. According to law enforcement, the bag was laying on its side "with its contents plainly visible to anyone standing outside the vehicle" and contained a large quantity of United States currency in various denominations. Opp'n at 12. Law enforcement also claims they saw on the passenger seat floorboard (*i.e.,* in front of where Williams was sitting) a blue bag containing numerous wrapped packages, which the officers (based on their training and prior experience) "immediately recognized" to be bricks of heroin. Opp'n at 12; Amendola Affidavit ¶ 19.

However, law enforcement did not search the car immediately after claiming to see the drugs; instead, they opted to request a police canine unit. Opp'n at 12. Around 3:20 PM, a narcotics-trained canine arrived and alerted law enforcement to the presence of narcotics in the vehicle. Amendola Affidavit ¶ 19. Officers then searched the car. The blue bag in front of Williams' seat contained around 100 bricks of heroin, and the bag in front of where Deas sat contained about $30,000. *Id.* The officers also seized about $5,000 in cash from the center console and cell phones from both the front driver's and passenger's seats. Opp'n at 13. Deas and Williams were then placed under arrest. *Id.*

Later that day, law enforcement obtained and executed a search warrant for Deas' residence. *Id.* During that search, law enforcement discovered and seized over 4,500 bricks of heroin infused with fentanyl, a large quantity of cocaine, and nearly $287,000 in cash. *Id.*

**C.     The Charges**

On May 4, 2023, a federal grand jury returned a two-count indictment against Defendants. Indictment. Count One charges Deas with possession with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). *Id.* Count Two charges both Williams and Deas with distribution and possession with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). *Id.*

Williams filed a motion to suppress and sever. Williams Mot. Deas then filed a separate motion to suppress. Deas Mot. The Government opposes. Opp'n. Williams and Deas each reply. Deas Reply; D.E. 48 ("Williams Reply").

**II.     ANALYSIS**

Both Defendants argue that law enforcement lacked a constitutional basis to seize them and subsequently search their possessions on July 11, 2022, and move to suppress the fruits of those searches. Williams Mot.; Deas Mot. Williams also moves to sever his case from Deas'. Williams Mot. For the reasons explained below, the Court will **DENY** both Defendants' motions.

**A.     The Searches and Seizures of Defendants Were Lawful**

The Fourth Amendment affords protections against "unreasonable searches and seizures" of a person's "effects." U.S. Const. amend IV. "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson,* 305 F.3d 164, 167 (3d Cir. 2002). When law enforcement executes a seizure without a warrant, the government must prove by a preponderance of the evidence that "each individual act constituting a search or seizure under the Fourth Amendment was reasonable."

7

*United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005). Evidence obtained through unreasonable searches and seizures must be suppressed as "fruit of the poisonous tree." *United States v. Bey*, 911 F.3d 139, 144 (3d Cir. 2018) (citing *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006)).

The warrant requirement is, however, subject to certain exceptions. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). For example, law enforcement may arrest an individual without a warrant in a public place if they have probable cause to believe that person has committed or is committing a felony. *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). Although there is no one definition of probable cause, courts generally call for a reasonable ground for belief of guilt, and that the belief be particularized with respect to the person to be searched or seized. *Id.*

Law enforcement may also conduct a brief, investigatory stop when the officer has a "reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123, (2000) (quoting *Terry v. Ohio*, 392 U.S. 1, 88 (1968)). The *Terry* analysis also applies when the crime in question has already been completed. *Brown*, 448 F.3d at 244 n.7 (citing *United States v. Hensley,* 469 U.S. 221, 229 (1985)) ("[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion.").

When considering if a police officer had reasonable suspicion to stop, or probable cause to arrest, reviewing courts first analyze the events leading up to the stop or arrest, and then decide whether those facts, "viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). Under this approach, courts must consider the officers' background and training and permit them "to draw on their own experience and specialized training to make inferences from

8

and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

      *1.*  *The Defendants were seized, not arrested, when ordered out of the Kia*

  The Court must first determine the moment Defendants were seized. *Brown*, 448 F.3d at 245. "A seizure occurs when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.'" *United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015) (quoting *id.*). The Court concludes that Defendants were seized when law enforcement boxed in the Kia and, with at least one weapon drawn, ordered Defendants out of the car.

  Although Williams appears to characterize the stop as an arrest,[7] Williams Mot. at 3-4, "'police actions in blocking a suspect's vehicle and approaching with weapons ready, and even drawn, does not constitute an arrest per se.'" *United States v. Johnson*, 592 F.3d 442, 448 (3d Cir. 2010) (quoting *United States v. Edwards,* 53 F.3d 616, 619 (3d Cir. 1995)). "Nor does placing a suspect in handcuffs while securing a location or conducting an investigation automatically transform an otherwise-valid *Terry* stop into a full-blown arrest." *Id.* (citing *Baker v. Monroe Twp.,* 50 F.3d 1186, 1193 (3d Cir. 1995)).

  Indeed, courts have consistently recognized that "when police officers make an investigative stop, they may take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" *Id.* at 619 (quoting *Hensley,* 469 U.S. at 235). Law enforcement's conduct here—boxing in Deas' Kia, ordering both Defendants out of the car, and placing them in handcuffs—falls within the scope of a seizure. *See*

---

[7] Deas provides additional context as to the nature of the stop and argues it went beyond the scope of a *Terry* stop. Deas Reply at 4-5. Because Deas offers this argument for the first time in his Reply brief, it is waived. *Aiellos*, 2009 WL 3486301, at *1; s*ee also United States v. Heilman*, 377 F. App'x 157, 188 (3d Cir. 2010).

9

*United States v. Goode*, 309 Fed. Appx. 651, 653-54 (3d Cir. 2009) (unpublished) (finding that an officer drawing their gun, ordering defendant to the ground, and handcuffing him did not exceed the bounds of an investigatory stop where defendant was suspected of drug dealing, a crime frequently associated with weapons and violence). Because Defendants were seized, not arrested, law enforcement only needed reasonable suspicion to order them out of the Kia.

> 2. *The seizure was supported by reasonable suspicion*

The Court must next consider whether the seizure was supported by reasonable suspicion. *Brown*, 448 F.3d at 245. "[T]he detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417-18 (1981). In evaluating whether there was an objective basis for reasonable suspicion, courts consider "the totality of the circumstances—the whole picture." *Id.* at 417. A reasonable suspicion may be the result of any combination of one or several factors: specialized knowledge and investigative inferences, personal observation of suspicious behavior, or information from sources that have proven to be reliable. *United States v. Nelson*, 284 F.3d 472, 478 (3d Cir. 2002). The standard requires only a "minimal level of objective justification." *Wardlow*, 528 U.S. at 123. "Courts give considerable deference to police officers' determinations of reasonable suspicion." *United States. v. Mosley,* 454 F.3d 249, 252 (3d Cir. 2006). "The ultimate question is whether a reasonable, trained officer . . . could articulate specific reasons justifying" the seizure. *Johnson*, 332 F.3d at 206.

Williams argues that law enforcement "point[s] to no facts that would objectively suggest Williams or Deas had engaged in any criminal activity." Williams Mot. at 4. Deas similarly contends the police lacked reasonable suspicion to order Defendants out of the car. Deas Mot. at 7. In making these arguments, Defendants appear to focus on the parties' conduct only on July 11, 2022. The Court, viewing the totality of the undisputed information known to the police on July

10

11—primarily, Deas' statements made in recordings in June 2022—concludes law enforcement had reasonable suspicion to seize Deas, and in turn, Williams.[8]

In fact, the multiple recordings of Deas and the CS, reviewed by law enforcement, alone provided law enforcement with reasonable suspicion. Although the Court detailed these conversations above, three actions by Deas are worth repeating. *First*, Deas told the CS that his supplier was leaving town through the end of July and told the CS he placed a large order in advance as to not run out of supply while his supplier was away. *See generally* June 15 Recording. *Second*, Deas, on camera, appears to sell the CS 150 grams of cocaine. *See* June 17 Recording 2 at 10:21; June 17 Recording 3 at 5:50. *Third*, Deas expressed first-hand knowledge of narcotics trafficking and the amount of narcotics individuals were selling per week. *See* June 15 Recording at 16:10-16:22 ([n***** just ain't out here just moving 4-500 bricks a week. I said, I said, trust me, **I know this.**") (emphasis added).

Moreover, while investigating Deas, law enforcement searched his criminal history, which showed he had three prior felony convictions for narcotics-distribution offenses. Opp'n at 3-4. This information also contributed to the totality of the circumstances that provided the police with reasonable suspicion to conduct an investigatory stop. *See United States v. Green*, 897 F.3d 173, 187 (3d Cir. 2018) ("Though a criminal record, much less an arrest record, is not sufficient to establish reasonable suspicion, it is a valid factor."). The "utility" of the criminal record is "enhanced" when the prior offenses relate to the crime law enforcement is investigating. *Id.* (citing *United States v. Conley*, 4 F.3d 1200, 1207 (3d Cir. 1993)).

---

[8] See *supra,* Section III.A.1, for an explanation as to why law enforcement was authorized to handcuff all occupants of Deas' car in furtherance of their investigatory stop.

11

Furthermore, law enforcement may effectuate a *Terry* stop if they have "a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony." *Hensley*, 469 U.S. at 229. For stops to investigate crimes previously committed, courts use the "'same test'" used for "stops based on imminent or ongoing crime and assess their reasonableness by 'balanc[ing] the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion.'" *United States v. King*, 764 F. App'x 266, 268 (3d Cir. 2019) (non-precedential) (quoting *id.* at 228).

Before July 11, the police obtained multiple hours of video recordings of Deas and the CS arranging drug deals, discussing Deas' drug business, Deas mentioning that he would be obtaining a large supply of drugs in preparation for his supplier leaving for the month of July, and Deas providing the CS on camera with what appeared to be cocaine. Opp'n at 9. Therefore, law enforcement had ample reason to believe that Deas was involved in completed and ongoing felonies, and in turn, the *Terry* stop was supported by reasonable suspicion.

Although the Court's analysis focuses on reasonable suspicion given it found Defendants' initial encounter with the police on July 11, 2022 was a *Terry* stop, the above conduct also provided the police with probable cause to arrest Deas for already completed crimes.[9] "Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has

---

[9] Deas purports to dispute that law enforcement had probable cause to stop Deas from information gained before July 11, 2022, by asking "where is the ___arrest___ warrant?" Deas Reply at 8 (emphasis original). This argument is unpersuasive. "Evidence that may prove insufficient to establish guilt at trial may still be sufficient to find the arrest occurred within the bounds of the law." *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994). Thus, law enforcement was not required to arrest Deas the first opportunity they could, nor does the absence of an arrest warrant negate the presence of probable cause.

been committed by the person being arrested." *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002). This "is not a high bar" to meet. *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (internal quotations omitted). Put simply, law enforcement obtained probable cause to arrest Deas when he, on camera, engaged in a narcotics transaction with the CS and admitted to a litany of criminal conduct, including obtaining a large possession of narcotics to sell while his supplier was out of town for the month of July.[10]

### 3.   *Williams lacks standing to challenge the search of Deas' Kia*

Williams next argues that law enforcement's search of the Kia was unconstitutional. Williams Mot. at 4. Williams, however, lacks standing to challenge the search of Deas' car.

"Standing to challenge a search requires that the individual challenging the search have a reasonable expectation of privacy in the property searched . . . and that he manifest a subjective expectation of privacy in the property searched." *United States v. Baker*, 221 F.3d 438, 441 (3d Cir. 2000), *as amended* (Sept. 21, 2000) (internal citations omitted). In other words, "to invoke the Fourth Amendment's exclusionary rule, a defendant must demonstrate that *his own* Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010) (internal citations omitted) (emphasis added).

"A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas v. Illinois*, 439 U.S. 128, 134 (1978). Thus,

---

[10] Relying on *United States v. Williams*, Deas implies that information learned in June 2022 was too "stale" to justify removing Deas from his Kia. Deas Reply at 8 (citing 124 F.3d, 411, 420 (3d Cir. 1997)). In *Williams*, the Third Circuit rejected defendants' argument that information learned from a confidential informant a decade prior was stale because of the continuous and ongoing nature of the criminal activity. *Id.* Here, law enforcement observed Deas on camera—a month prior to the arrest—referencing purchasing narcotics to last him through the end of July. Thus, on July 11, the information was not stale; in fact, it is hard to see how it could be more fresh.

13

courts have consistently made "clear that a passenger in a car that he neither owns nor leases typically has no standing to challenge a search of the car." *United States v. Williams*, No. 09-878, 2010 WL 3258268, at *5 (D.N.J. Aug. 16, 2010) (quoting *Baker*, 221 F.3d at 441-42).

Williams fails to show he had a Fourth Amendment protected interest in the Kia. Nor does Williams dispute in his Reply the Government's argument that he lacks standing. *See generally* Williams Reply. Although Williams certifies that he had a possessory interest in the *bag* he carried into the Kia, D.E. 39-1 ¶ 3, the Government correctly notes this does not provide him with a legitimate expectation of privacy in the *car*. Opp'n at 37 (citing *Rawlings v. Kentucky,* 448 U.S. 98, 104 (1980)). Because Williams does not have a Fourth Amendment protected interest in the Kia, he lacks standing to challenge the search of it. Therefore, having found that the police had reasonable suspicion to seize Deas and Williams, the Court will **DENY** Williams' Motion as to the suppression of evidence.

### 4. The search of Deas' Kia was lawful

Deas, however, does have standing to challenge the search of the Kia. He makes two arguments as to why the drugs and money obtained in the search should be suppressed. Both lack merit.

*First*, Deas contends "the Government having affected an unconstitutional seizure by removing [] Deas out of his vehicle, that which thereby became in plain view is inadmissible." Deas Mot. at 8. In other words, because the predicate seizure was unconstitutional, any observation made subsequent to that illegal seizure ought to be suppressed. The Court disagrees. As explained *supra*, Sections II.A.2-3, the police had reasonable suspicion to conduct a *Terry* stop to question Deas, and therefore, they did not conduct an unlawful seizure when ordering Deas out of his vehicle. It follows that any subsequent observation of drugs in plain view would have been the fruits of a legal seizure and could have formed the basis of law enforcement's probable cause

determination to search Deas' Kia without a warrant. *See United States v. Jones*, No. 09-171, 2011 WL 2118708, at *7 (W.D. Pa. May 25, 2011), *aff'd,* 503 F. App'x 174 (3d Cir. 2012) (finding officers had probable cause to search a car after observing bricks of heroin in plain view).

*Second*, in passing, Deas disputes law enforcement's contention that the drugs were in plain view. *See* Deas Mot. at 7 ("Amendola alleges that, once Deas and Williams were ordered out of the Kia, the money and CDS were in plain view. Even if that were established as a matter of fact, it avails the Government nothing as a matter of law."). To the extent Deas challenges whether the drugs were in plain view, this Court finds that dispute ultimately immaterial because a narcotics-trained canine alerted law enforcement to the presence of narcotics in the vehicle, Amendola Affidavit ¶ 19, providing an independent basis to search the car.[11] As courts have made clear, a canine's positive alert to narcotics independently gives rise to probable cause to search the vehicle without a warrant. *United States v. Pierce*, 622 F.3d 209, 213 (3d Cir. 2010). In turn, "under the automobile exception to the warrant requirement, law enforcement officers may seize and search a vehicle without a warrant if probable cause exists to believe that the vehicle contains contraband or evidence of a crime." *United States v. Wimbush*, No. 19-134, 2020 WL 1873020, at *16 (D.N.J. Apr. 15, 2020) (citing *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002)). Because law enforcement developed an independent basis for obtaining probable cause to search the Kia through the positive alert of narcotics from the canine, the fruits of that search need not be suppressed without relying on any plain view observation of narcotics. Therefore, the Court will **DENY** Deas' Motion as to suppression of the drugs and money found in the Kia.

---

[11] Although it does not appear to be in dispute, the decision to call the narcotics-trained canine does not turn on the visibility of the drugs as the Court determined that law enforcement had reasonable suspicion to seize Defendants for conduct occurring before July 11, 2022.

### 5. *The search warrant was legally obtained*

Deas also asserts that the fruits of the search of his home—nearly $300,000 and 4,500 bricks of heroin—should be suppressed because the search warrant was not supported by probable cause as it primarily relied on illegally obtained evidence. Deas Mot. 8-9. In essence, Deas' contention rises and falls with the success of his earlier arguments that he was unlawfully seized and that the search of his car was illegal. Having found both the seizure of Deas and the subsequent search of his Kia legal, it necessarily follows that the fruits of that search could form the basis of the magistrate judge's determination in issuing a warrant to search Deas' home.

Deas also argues that "nothing the CS said provided the Government with probable cause to search Mr. Deas' home for contraband on July 11." Deas. Mot. at 9. As noted above, the Court does not (and need not) rely on any statements the CS made to conclude there was probable cause to issue a warrant to search Deas' home because *Deas'* statements alone provided the probable cause to search. On multiple occasions, Deas tells the CS details about his drug business. For example, on June 15, 2022, Deas tells the CS that his supplier is "load[ing] [him] up 'til the . . . end of July," and that his order was so large it would require two trips to deliver. June 15 Recording at 19:45-19:58; 21:07-21. Thus, even excluding all evidence obtained in Deas' car and all statements made from the CS, the Court finds the magistrate still had sufficient basis to conclude that there was a "'fair probability that contraband or evidence of a crime' would be found at [Deas'] residence." *United States v. Stevenson*, 832 F.3d 412, 430 (3d Cir. 2016) (citing *Gates*, 462 U.S. at 238). Therefore, the Court will **DENY** Deas' Motion.

### B. The Court Will Not Sever

The Court next considers Williams' motion to sever the two counts of the Indictment. Count One charges Deas with possession with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Indictment. Count Two charges both Williams and Deas with

distribution and possession with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). *Id.*

"Rule 8(b) states that '[t]wo or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.'" *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (quoting Fed. R. Crim. P. 8(b)). There is a "preference" in the federal system for joint trials of defendants who are indicted together because "they promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *Id.* (quoting *Richardson v. Marsh,* 481 U.S. 200, 209 (1987)).

However, Rule 14 allows courts to sever if either the Government or a defendant appears to be prejudiced by the joinder of trials. Fed. R. Crim. P. 14(a). The burden of showing prejudice from the joinder is placed on the defendant seeking severance. *United States v. Eufrasio*, 935 F.2d 553, 568 (3d Cir. 1991) (citations omitted). This is a "heavy burden," and requires a defendant to "establish that denying severance would lead to "clear and substantial prejudice resulting in a manifestly unfair trial." *United States v. Urban*, 404 F.3d 754, 775 (3d Cir. 2005). In other words, severance under Rule 14 is warranted "only if there is a *serious risk* that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 539 (emphasis added).

In *Zafiro*, the Court noted three instances where severance might be warranted: (1) "a complex case" where "many defendants" a tried together with "markedly different degrees of culpability;" (2) a case like *Bruton v. United States,* [citation omitted], "where evidence that is probative of one defendant's guilt is technically admissible only against a co-defendant;" and (3) a case where exculpatory evidence is unavailable in a joint trial but would be available if the

17

defendant were tried alone. *Zafiro*, 506 U.S. at 539. At bottom, the key question is whether a jury could reasonably "compartmentalize the allegedly prejudicial evidence in light of the quantity and limited admissibility of the evidence." *Eufrasio*, 935 F.2d at 568 (citations omitted).

"Rule 14 leaves the determination of the risk of prejudice as well as any appropriate remedy to the sound discretion of the trial court." *United States v. Scarfo*, No. 11-740, 2012 WL 4120504, at *12 (D.N.J. Sept. 19, 2012), *aff'd*, 41 F.4th 136 (3d Cir. 2022), *judgment entered sub nom. United States v. Maxwell*, No. 15-2925, 2023 WL 11282245 (3d Cir. July 17, 2023) (citing *Zafiro*, 506 U.S. at 541). Therefore, severance is not "automatic," "even if a defendant can establish some prejudice resulting from joinder." *Id.*

Here, Williams argues severance is appropriate because "it is nearly impossible for a jury to compartmentalize" the allegations in the two counts of the Indictment. Williams Mot. at 9. Namely, while Williams is charged with engaging in a "street level transaction," Deas alone is alleged to have about 4500 bricks of heroin and nearly $300,000 in his home. *Id.*

The Court disagrees because "[p]rejudice should not be found in a joint trial just because all evidence adduced is not germane to all counts against each defendant." *Id.* (citing *U.S. v. Sandini,* 888 F.2d 300, 307 (3d Cir. 1989), *cert. denied,* 494 U.S. 1089, 110 (1990)). "Further, the mere introduction of other crimes evidence against one defendant does not entitle a co-defendant to a separate trial." *United States v. McGlory*, 968 F.2d 309, 340 (3d Cir. 1992).

There are only two Defendants in this case and only two counts in the Indictment. The Court believes a jury could compartmentalize the charges brought against Deas and Williams and those brought against Deas alone. As the Government notes, the "supposed prejudice of being tried with a co-defendant charged with the same or similar crimes amounts to at worst, 'the same potential for prejudice that every criminal defendant faces when multiple counts are tried

18

together.'"  Opp'n at 45 (quoting *United States v. Joshua*, 976 F.2d 844, 848 (3d Cir. 1992)). Moreover, the Court can "significantly reduce the risk of such prejudice through the use of carefully crafted limiting instructions to the jury." *Scarfo*, 2012 WL 4120504, at *15 (citing *United States v. Console,* 13 F.3d 641, 655-56 (3d Cir. 1993)).

Williams fails to meet his heavy burden of establishing a jury could not compartmentalize the two counts of the Indictment.  Therefore, the Court will **DENY** his Motion to sever.

### III.  CONCLUSION

For the reasons above, the Court will **DENY** both Defendants' motions.  An appropriate Order accompanies this Opinion.

April 7, 2025

_____
Evelyn Padin, U.S.D.J.